Munford vs. Wilson et al.

MUNFORD vs. WILSON ET AL.

1. An agreed case stands in lieu of a special verdict; and the court pronounces the conclusion of law, as if the same facts had been found by special verdict.

2. The parties may agree to certain facts involved in the case, which they do not wish to controvert, while they still dispute other matters of fact on either side. In such case, the agreement, when signed, is used before the tribunal, which tries the question of fact, as evidence, concluding the parties, so far as they have agreed; but in that case, the judgment will be upon the finding of the facts, and not upon the agreed case.

3. A contract was made between client and attorney, by which the attorney was to establish the clients rights to an interest in certain property; and to institute such proceedings, in law or equity, as he might judge proper to assert such right, and to compromise as he might judge advantageous, and was to have one third of whatever might be realized by compromise or recovery. Two days afterwards, another contract was made, including the terms of the first, and going beyond it. Held, that no action could be maintained upon the first contract.

C. GIBSON, for appellants.

Munford was a stranger to the defendants and had no interest whatever, in the land mentioned in the contract which is the cause of this action, as appears by the contract itself it was in the adverse possession of other persons. He entered into the contract, and commenced suit against Carr and others, not from motives of charity or justice, but simply as a speculation, or, to use a strong western phrase, as a Land Pirate.

The contract is, not to secure him the reasonable value of his services out of the amount to be recovered against Carr and others, but it is to have one third of 40 arpens of land within and near the city of St. Louis.

These two contracts show, that Mrs. and Miss Hempstead and the plaintiff deliberately commenced a war against any and every person that was so unfortunate as to have ever purchased, or owned a footof ground that had once belonged to the estates of Edward or Thomas Hempstead, and they agree to share the spoile of the land piracy between them. (I feel called upon, here to plead for my clients that one was a widow and the other a minor, and that both were under the professional treatment of the plaintiff.) Munford, who never could have had any just claim against the defendants for more than a just compensation for his services, is to have one third of all the profits of the speculation. "That their rights and interests in said property may be established, they engage the professional services of the plaintiff, as their sole counsel," and agree to give him "one third part of what may be realized to either of them from the property."

The defendants compromise, and if the plaintiff can recover then the contract must be so construed, that the defendants were prevented, by reason of the contract, from compromising with Carr and others, and that by so doing they injured the plaintiff, violated the contract and are responsible to the plaintiffs as if he had carried the contract to a successful issue, or had, himself, compromised the claim.

Munford does not sign the contract, nor bind himself, in any way, to do any thing whatever. The defendants could therefore, in no case, have any recourse upon him by virtue of the contract.

The defendants contend that this contract is void, for the following reasons:

I. It is malum in se, for such contracts are never made to promote the ends of justice, but

always as a speculation; for if one person believes another is unjustly deprived of his property, and is desirous of aiding him to gain it, and does so aid him, surely he cannot, on any principles of justice, demand more than a just remuneration for his labor and expenses, and we may safely say that every contract of this kind gives the speculator more than a just compensa·ion, and more than the law would allow him, for the law allows and defendants offer to account to him on the *quantum meruit* for his services, without any special contract at all.

There is no consideration to support contracts of this kind, beyond the value of the services rendered.

If the 40 arpents of ground belonged to Carr and others, the effect of this contract could only be, to vex them with unjust litigation or levy black mail by forcing them from practical business considerations to compromise; and if it belonged to Miss Hempstead, then the attorney, who never pretended to have any title to the land, comes in as *quasi* heir and takes one third of the whole. The same reasons apply, with equal force, to all contracts similar to the one in this case.

Such contract, when made between clients and attorneys, tend to corrupt the profession and greatly jeoperdize the rights of clients: See authorities hereinafter cited.

II. 1st. It is opposed to policy.

Now take the case at bar, as an example. It is immaterial to the public, whether Carr or Hempstead owns forty arpens of land in and near the city of St. Louis, but it is of great importance to society, that when that tract of land has been possessed by Carr for many years, and whole neighborhoods have settled upon it, that the title to it should remain undisturbed. We need not travel beyond the limits of this city to prove how much the continual agitation of titles to real estate retards the growth and prosperity of a community.

2d. The enforcement of such contracts encourages litigation, which the laws of every well governed country sedulously avoid, and invites speculators without any risk to themselves, to meddle with suits that no way concern them; the expenses whereof, if lost, fall upon the parties and the profits of which, if won, are to be shared by the guilty maintainor, and a contract like the present one, will never be entered into from any other motives than personal gain on the part of the maintainor.

3d. The good of this community and the whole spirit of our legislation strongly opposes, so far as is consistent with justice, the stiring up of dormant titles to real estate.

I can see no reason why the ancient but politic provisions of the common law should not apply to this case. The repudiation of this contract wrongs no one; the principle that I advocate still leaves the plaintiff to claim the value of his services to the last farthing. It only discourages litigation and closes the door upon speculations that are improper in themselves and highly detrimental to the property of society at large.

Litigation is, as it were, a social decease that cannot be entirely cured, but should be avoided and shunned as much as possible: Wallis vs. The Duke of Portland, 3d Vesey 494; Weakly vs. Hall, 13 Ohio 167; 1 Ohio 60; and other authorities hereinafter cited.

Aiden vs. Patterson, 5 John's Ch. Rep. p. 48. "As a sworn minister of the courts of Justice, the attorney ought not to be permitted to avail himself of the knowledge he acquires in his professional character, to speculate in law suits. The precedent would tend to corrupt the profession and produce lasting mischief to the community."

8 John's Reports 484. Though this point (champarty) is sought to be questioned, so far as misdemeanor and punishment are involved, yet, the policy of the law may well require that every such conveyance be adjudged *void*: 9 Metcalf 489 and other authorities hereinafter cited; also, note to 4 Kent's Com. p. 448 and authorities there cited.

III. It is maintainous and champertous. Munford, who was a stranger both to the defendants and the title to the land, not only engages to establish the rights of the defendants to the land acknowledged to be in the adverse possession of others, for one-third of the land or amount of the land realized; but in the performance of the contract, as he alleges in the amended petition, "endeavored in all legal ways to secure and establish and recover the rights and interests of said Cornelia and Cornelia V., and the better to establish the rights and interests of said defendants

35

Munford vs. Wilson et al.

in and to said property, and the more effectually to secure the same, the plaintiff, at his own expense employed other counsel, learned in the law to aid and assist him in the prosecution of said suit and the rights of the defendants, which was by their approval: Coke on Littleton.

1st. To maintain, to have part of the land or any thing out of the land, or part of the debt or other thing in plea or suit is called cambipartia champartie: Bacon's Abridgment, title, "Champerty." "Champerty is the unlawful maintenance of a suit in consideration of some bargain to have part of the thing in dispute, or some profit out of it:" 4 Black. Com. page 96.

"Maintenance is an officious intermedling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise;" and by the Roman law it was "a species of crimen falsi to enter into any confederacy or do any act to support another's law suit, by money, witnesses or patronage:" Bell vs. Smith, 7 D. and E. 846; 5 B. and C. 188.

Where there is no agreement to divide the thing in suit, the party intermedling is guilty of maintenance only, but where he stipulates to receive part of the thing in suit, he is guilty of champerty. Blackstone says, that "a champeter is to carry on the party's suit at his own expense, and refers to 33 Ed. 1. The authorities, however, prove the contrary: See 1 Hawk. P. C. a 3; Coke on Littleton 368; 1 Russele 176; 7 D. and E. 846; 5 B. and C. 188; Key vs. Vattier, 1 Ohio page 60; Bacon's Abridgment (title, Champerty;) and see particularly, 9 Met. 989: See also, Finden vs. Parker, 11 Meeson and N. page 680.

The plaintiff, however, carried on the defendant's suit at his own expense; for he employed counsel, learned in the law to assist him, at his own expense, as appears by his own showing.

Champerty and maintenance constitute a part of the law of the land; not from any sympathy the law has for the plaintiff or defendants, but as a protection to property holders. Carr, Biddle and O'Fallon are the only persons with whom the law sympathises in this case, and it declares the present contract void, in order to prevent both the plaintiff and defendant from speculating against them. The obvious effect of suppressing such contracts as this, is to deter persons from entering into land speculations.

The fourth section of the act in relation to conveyances, Rev. Code 1845, does not repeal the whole of the common law doctrines of champerty and maintenance. This section only relates to the sale and conveyance of land, which can only be done by deed, duly executed and acknowledged. It has no relation, whatever, to contracts.

The conveyance of land in the adverse possession of another person was declared by 32 Henry VIII, to be champertous, maintainous and void. Yet, champerty and maintenance existed both in the civil and common law before the passage of this act. There was a whole "genus" of cases known in the common law under the title of champerty and maintenance, before this suit was made and this act only declared that the selling of lands not in the possession of the grantor should belong to this class of cases, and be punished, &c. The very term, champerty, derived from campum partier, or champs partir proves, that 32 Henry VIII was only an addition to these principles of the law. The 4th section of our acts repeals 32 Henry VIII, but it surely cannot be so construed as to repeal other provisions of the common and statute laws of England existing before and after the passage of that act, and having no relation to the sale or conveyance of real estate.

Neither does the assignability of choses in action, nor the privilege now given to witnesses to testify, repeal or annul the principle of law, "culpa est se immiscere rei ad se non pertenenti," and, that no one shall stir up litigation by maintaining a suit in consideration of a bargain to have part of the thing in dispute, or some profit out of it. Blackstone lays down the laws, relating to champerty in the strongest terms, yet, at page 385 (468,) vol. 2, he says, that choses in action may be assigned: Fite vs. Doe, 1 Blackford 127; 1 Ohio 60; 13 Ohio 167; Land Laws of Ohio; 15 Ohio 156—the sale of land in the adverse possession of another, is held to be good, notwithstanding by the former decision in that State, champerty and maintenance were declared to be good law, and which decisions were left unreversed and other authorities cited. Where there is no statute upon the subject champerty and maintenance prevail, as opposed to public policy and as a part of the common law: 1 Walker's Ch. Rep. p. 84; Rood vs. Chapin; 4 Dana Abs. 6 vol. 741, sec. 41; Key vs. Vattier, 1 Ohio p. 60; Weakly vs. Hall, 13 Ohio 167; Byrd vs. Orden, 9

Munford vs. Wilson et al.

Alabama 765; 7 Porter's (Ala.) Reports 490; 7 Smede & Marshall's Rep. 160; Swett vs. Poor, 11 Mass. Reports 549; 1 Pickering 415; 9 Metcalf 418; 5 Humph 379; 1 Black. 127; Arden vs. Patterson, 5 John's. Ch. Reports 48; 8 Johns. Rep. 484; Contra, 3 Haw R. 215.

Our statute adopts the common law, regardless of any law, custom or usage, and is in this respect different from the law of Delaware and much stronger in my favor.

The plaintiff relies chiefly on 3d Cowen 623, but this case was expressly decided on the ground "that Thallimer (the plaintiff) did not obtrude himself into the concerns of a stranger, but agreed to aid his relative. He was not the promoter of litigation in which he had no concern. His wife might inherit the land, and this reason alone exempted the contract from the imputation of champerty and illegal maintenance."

As to the reasoning of the chancellor. It was extra judicial and I think fallacious. The law does not close the courts of justice against the poor, as he in the same breath decides. He argues from assumed premises not admitted, and where he says that "in many of the States of this Union, these laws are not in force" he flatly contradicts Kent: See vol. 4 Kent's com. side page 449;) and further I assert, that at the time of that decision there was no single State where a champertous contract had ever once been held to be lawful, and I defy any person to produce a decision or statute to that effect, except 3 Harr. Rep., decided afterwards. His reasoning is contrary to the laws of his own State, and to the statutes of Connecticut, Vermont, Maryland, Virginia, North Carolina, Tennessee, Kentucky, Pennsylvania, and to the judicial opinions herein cited, including the reports of New York: See opinion of Kent C. J. in 4 Johns. Ch. Reports 48; 3 Harr., Bayard vs. McLean, is the only authority that I have been able to find against me; and that case is different from the one at bar, in this, that the plaintiff engaged to render his services as counsel and so forth; and in the present case Munford binds himself to do nothing. The suit was in fact commenced before Bayard was employed, and the amount, though large, was decided to be reasonable. Neither was there any statute in Delaware, introducing the common law, and the decision was made principally upon the custom of that State. If this brief had not already been swollen too large, I think I could show very clearly that the court had misconceived the common law, and that it was clearly erroneous in its conception of the principles decided in the various cases cited in that opinion, and in supposing that those cases were decided on the peculiar circumstances of each case, and not on any great and general principle of law. The case was decided against Bayard on another ground, so that even this case is not a direct judicial decision, opposed to the doctrine I advocate.

I do not think I need say any thing about 3 Mo. Reports, Chauvan vs. McGirk. It was read, but not relied on below, and clearly decides nothing one way or the other about the case under consideration. Neither of these three cases meet or overcome the point, that litigiousness is an evil that sound policy requires the law to discourage; and that the suppression of such contracts as the present, whereby a stranger engages to assist in another's law suit, that no way concerns him; not from the promptings of kindred affection, nor charity, nor justice, but for a speculative contingent reward out of the land sued for, harms no one and has a direct tendency to prevent what I may term speculative litigation. I think that after an almost continuous session of six months, it will not be hard to prove to your Honors that litigation is an evil, and that suits commenced as a speculation, ought to be discouraged as much as possible. The common law in relation to champerty and maintenance, except as to punishment, prescribed by British statutes prevails in this State.

Revised Code, 1845, page 693: "The common law of England and all statutes, acts, &c., &c., which are of a general nature, not local to that kingdom nor repugnant to nor inconsistent with ...... the statute laws in force for the time being, shall be the rule of action and decision in this State, any law, custom or usage to the contrary notwithstanding." It is contended that the legislature did not intend that the custom or usage of certain speculators should make the law, but in this State we are to look into the statute book or the common law only, for the rule of action, without any regard to speculations entered into by certain members of the bar and other persons.

Champerty and maintenance, so far as the defendants invoke the doctrines, are from their very nature of a general nature of not local to any place or time. They were a part of the common

Munford vs. Wilson et al.

law before any statutes were passed on the subject: 4 Blackstone, 96: Also of the Roman law 4 Blackstone 96; 2 Bacon's Abridgment, title, Champerty.

Excepting Delaware (the smallest State in the Union) there has never been nor is there now any country in the whole world, so far as I can discover, after a most thorough examination, where such contracts are not and have not not always been held to be void.

It is a principle of the common law, itself, that the reason ceasing, the law also ceases, and it may be, that the reasons that gave birth to some of the English statutes, may not exist in this State, but these principles have a deeper root than any of the English statutes. Such contracts were void by the common law before any statute as *malum in se*, and contrary to public policy: 3 Vesey 494; 4 Black. 96; 2 Coke's Institutes, 202; Bacon's Abrgt., title Champerty, and other authorties cited herein. This point will be maintained, if the point I make is established, that where there is no statute the common law prevails, on this subject.

I contend that champerty and maintenance prevail in Missouri by reason of the Statutes See Rev. statutes of Indiana, 1843, page 1030, where the common law is adopted word for word almost as in our statute, omitting the clause of our statute "any law, custom or usage to the contrary, notwithstanding," being thus far less obligatory than our code.

Then in Fite vs. Doe, 1 Black. 127, Chf. Justice Blackford, in giving the opinion of the court decides thus: "We have no particular statute prohibiting the buying and selling of pretended titles, and, therefore, reference must be had for the doctrine to the common law of England, which is adopted into our code: See p. 129. The statute of 32 of Henry VIII, is only in addition to the common law."

V. The contract is *nudum factum*.

Munford does not sign the contract or engage in any way to do any thing whatever. The only effect of the contract (if it has any effect at all) is, to bind the defendant to pay a grossly exorbitant amount to the plaintiff; prevents them from compromising or doing any thing that may conflict with the terms of the contract, while the plaintiff is not bound in word or deed to do any thing whatever. The subsequent labors of the plaintiff entitle him to a just compensation for his services, but nothing more: Thomas vs. Trustees, &c., 3 A. K. Marshall, 298.

The contract was made by the attorney, with a widow and her daughter, who was at that time a minor, and both of whom were entirely unadvised as to their rights; and the attorney not only makes the contract so as to bind no one but the defendants, but stipulates for a price which, if the defendants had any just claim to the land, was grossly unreasonable. The plaintiff has never done any thing more than bring a suit and argue motions in court for which he has already received seven hundred dollars, exclusive of $150 paid to Mr Haight, and the defendants offer to pay him a reasonable compensation for every thing he did, but he demands, in this suit, the enormous sum of nearly twenty-seven hundred dollars more. The simple statement is enough to satisfy any person that the sum demanded by the plaintiff in this suit is inconsiderable and grossly inadequate and disproportionate to the services rendered. The contract is, therefore, void between client and attorney: See 9 J R. 2, Star vs. Vanderheyden; 1 Hopp. Ch. Reports, Bernen vs. McLean and authorities there cited; Rose vs. Maynot, 7 Yerger 30; 2 Dana 228; 5 Johns. Ch. Rep. p. 48, 49, opinion of Kent.

I do not contend that all contracts between clients and attorneys are void, but, that where the clients are in a situation to be easily imposed upon and the amount bargained for by the attorney is grossly exorbitant, then the attorney, who knows the value of title and who stands n a highly confidential relation towards the client, and is placed in a condition to take the greatest advantages of his client who must depend upon his attorney for information about the title, at least for a correct estimate of its value, then, I say, it is incumbent on the attorney to show, affirmatively, that there was fair dealing: 8 Johns. Ch. Reports, 48.

The circumstances of this case were such as to call upon the plaintiff to show that there was fair dealing and the subsequent compromise with O'Fallon proves nothing, for the defendant might well have given the plaintiff one-third of the amount received as a compensation to

Munford vs. Wilson et al.

him and Mr. Field, and they might, at the same time, have been altogether unwilling to give the plaintiff alone one-third of what he made. When this sum was given, Field was in the case and had written the only bill that was properly drawn.

Besides the exorbitance of the price demanded, there was evidence showing want of skill in the management of the suit.

Such a contract between an attorney and an infant female is void, and if void it could not be ratified; and even if not void the simple act of the compromise with O'Fallon and permitting the plaintiff to retain one-third of the amount received, particularly when the whole business was done by Mrs. Hempstead, was not sufficient to ratify the contract as far as Mrs. Wilson is concerned. Mrs. Wilson may well have thought that $700 was not too much to pay Munford and Field, (they were both in the case) or, that if it was too much it could be taken into account at the close of the suit. She may have been willing to give Munford and Field one-third, and not to give Munford, alone, one-third. Surely every principle of law and common sense requires, that the ratification of such a contract shall be plain and most unequivocal. The letter of Wilson, and all other things given in evidence only show that Wilson recognized Munford as attorney in the case and are entirely silent as to the contract The second contract was a substitute for the first contract. The only difference between them is the addition of Mr. Todd, and the including, of the whole of the estates of Edward and Thomas Hempstead, of which the 40 arpent tract was a part.

By the second contract, Todd and Munford were to "establish the rights and interests of each of the defendants in each and both of said estate" and receive as "compensation to them for all such services, we hereby covenant that they may and shall have receive one equal third part of all the property, money and effects of each of said estate, &c."

Is not the conclusion irresistable, that the parties, after further consideration, and the employment of Mr. Todd, did make another bargain as to the whole matter. It is not unreasonable to suppose, that Mr. Todd should have been employed as to every thing else except the forty arpent tract, particularly when the ink was hardly dry with which the first contract was written, and Munford had done nothing whatever towards the fulfillment of the first contract. Therefore, the second, third and fifth instructions asked by the plaintiff and given, should have been refused, for there was not the slightest word of evidence to support it: and the fact that plaintiff brought suit against Carr and others, raises no greater presumption that it was under the first than the second contract, particularly as the plaintiff brought many suits under "said contracts," as appears by the first petition.

The third instruction given for the plaintiff should have been refused, for the same reason.

Upon what principle the learned judge of the court of common pleas refused the eighth instruction, asked by the defendants, and then found for Mrs Hempstead and against Mr. and Mrs. Wilson, I leave to his fertile imagination to explain.

There was evidence tending to prove want of skill on the part of the plaintiff, in the management of the suit vs. Carr and others, and, therefore, the refusal of —— instruction asked by the defendants was clearly erroneous, and the giving of plaintiff's —— instruction does not cure the error.

The defendants have a right to be sued, if at all, on the contract on which they are liable, The setting up of the second contract is not a mere technical defence When sued upon it, the defendants will make those defences to it, which, in my opinion, will be good as against it.

I went into court to defend against the first contract. The defence, that the defendants, if liable at all, were liable on another contract, was a perfect defence. It would have been positively erroneous in practice in me, to set up the second contract and then show my defence to the defence.

The plaintiff has had the case against Carr and others and the present ease in court for about seven years. He has received $700 from the O'Fallon compromise; that is, $100 per annum for this case. I think that is pretty good pay, and that he is estopped from appealing to the sympathy of the court on this account.

As to the assignment of errors, I have only to say, that the record shows, that my demurrer

Munford vs. Wilson et al.

to the amended petition was sustained, and that judgment was rendered on a petition already demurred out of court. I, however, waived that formality. I do not perceive how the plaintiff, upon any principle of honor or fair dealing, can insist upon any technical defects upon my part. The motion for a new trial was not, however, necessary, and if so it was substantially a motion for a review, and the agreed case presented the facts upon which it was founded.

The plaintiff says, that the contract comes within our statute, because of the covenant to convey. Now suppose this part of the agreement had not been inserted (and for all the purposes of this action it might as well have not been inserted,) is the contract valid? If the counsel, by his broad assertion, that every State in the Union has abolished champerty and maintenance, means that choses in action have been universally made assignable, I entirely agree with him; and then, by reference to the authorities above cited, my point, that the assignment of choses in action was only a part of the laws of champerty—as it were, an individual of the species, is fully established. This is the more apparent, as it would have been the extremest folly to forbid the sale of tands not in the possession of the vendor, the assignment of choses in action, the giving of evidence voluntarily; and at the same time to permit parties to enter into contract to prosecute law suits for part of the land recovered!

The plaintiff has, I presume, been industrious to get the opinion of the lawyers on his case. For my part, I should be ashamed to hold up the supposed opinion of the profession as the law of the land.

If I thought it becoming the dignity of the supreme court of Missouri, it would give me great pleasure to answer the briefs filed by the learned counsel for the plaintiff and notice some of their authorities—particulary the Declaration of Independence, that all men are born free and equal; the bill of rights; the Western Law Journal, and the "circumstance of the case."

## U. Wright for respondent.

The defence is, first, that the contract is void for Champerty: second, that if the plaintiff had any right of action, it is on the second and not on the first contract: third, infancy: fourth, that the judgment was informal, not stating the facts upon which it was rendered.

The first defence is an obsolete notion, long since exploded by a more free and enlightened policy. It had its origin in the old idea, that things in action and not in possession, could not be assigned or conveyed. Blackstone says: "that by the ancient common law, it was thought to be a great encouragement to litigiousness if a man was allowed to make over a stranger his right of going to law." But this nicety is now disregarded, though, in compliance with the ancient principle, the assignment was in the nature of a declaration of a trust, and the assignee might use the name of the assignor to recover the possession. But even in his time, courts of equity, as he says, found it necessary to protect the assignment of a chose in action as fully as the law would a chose in possession See 2 Black. Com. side page 443. The only reason given to sustain this ancient and absurd notion of the law, is that it was thought to be a great encouragement to litigiousness if a man was allowed to make over to a stranger his right of going to law. This was thought to be a great grievance and against public policy, and therefore some of the English judges, to effect this, restrained the right of the citizen to contract and be contracted with in what all enlightened men now consider as the fair subject of legitimate commerce. But can it be, that in a country like ours, where the organic law guarantees to each citizen that courts of justice shall be established, where a remedy is freely given, and justice is to be given, "without sale, denial or delay," that this fallacious reasoning can obtain any force. No; every State in the Union, where the common law prevails, have by their statutory law abolished this ancient rule of the common law, and made choses in action assignable, and given unembarrassed remedies in their courts to enforce the contract. The legislature of this State, at its last session, fully repealed the last vestige of

Munford vs. Wilson et al.

this ancient idea, by providing that all suits are to be prosecuted in the name of the party in interest. See art. 3, New Code of Practice.

We will now consider this notion of things in action not being assignable, as applicable to real property. By the English statute of Henry 8th, it is provided, that "no one shall buy or sell, nor obtain any pretended right or title to lands, unless the seller, his ancestors, or they by whom he claims, have been in possession of the same, or the reversion or remainder thereof, or taken the rents and profits for one whole year before, on pain that both seller and buyer shall each forfeit the value of such lands, the one-half to the king and the other to him who should sue." Coke says that this statute is the foundation of the Champerty law of England. In 3 Harrington, Boyd vs. McLain, the court announces the same doctrine. It is useless for me to give the history, the motives, or the reasons of the passage of the English statute; but if given, it would be seen that they have no application to our government, our state of society, or our laws. But our statute meets this statute face to face. I will give th language of our legislature: "Any person claiming title to any real estate, may, notwithstanding there may be an adverse possession thereof, sell and convey his interest therein in the same manner and with like effect as if he was in the actual possession thereof." Statutes of 1845, page 210, sec. 4. Now, if this contract upon which this suit is brought is void, it is void for champerty, for there is a covenant in it to convey one-third of the lands, if recovered. The statute is, that any person claiming title to any real estate, &c., may convey, &c. By the statute he can sell or covenant to convey as effectually as if in the actual possession; and if in the actual possession, he can convey or covenant to convey a part as effectually as he can the whole. Now I have shown that by the express sanction of the statute laws of this State, in force at the time this contract was made, things in action, both personal and real, could be legally assigned or conveyed as things in possession. This being established, it entirely subverts and removes the foundation upon which the champerty law of England rests. This contract being legal, the plaintiff had rights vested under it, that by the constitution even the legislature had not the power to divest. The inviolability of contracts and of vested rights, is guaranteed both by our federal and State constitution. Our bill of rights says, that "no law impairing the obligation of a contract, or retrospective in its operation can be passed." See sec. 17, art. 13. Then the question is, can this court declare a contract void which has the sanction of statute to sustain it, and the sanction of the constitution to protect the rights vested under it? American authorities will be cited to show that, by the common law, this was an offence, and that the common law was introduced here, therefore this contract was void. It will be seen, upon examination of the authorities cited, that they are very loose law, and that the subject was not mastered nor understood. Prior to the English statutes on this subject, the ancient common law, as it is termed, was not understood even there, and was in great confusion. I hold that all these loose and undefined notions of common law were merged in the English statutes, defining the offence and fixing the pains and penalties. In this view I am sustained by the case of Byrd vs. McLain, 3 Harrington, pages 215, 216, from which I make this extract : "We take it for granted, that the principles on which the ancient common law doctrine of champerty seems to have been founded never had any existence in our statu e; that in England this offence had no other basis in the year 1742 than the statute of Westm. 1 and 2nd, 28 Edwards 1st, and 33rd Edward 1st, to which alone we are to look for the character and quality of the offence prohibited by the act of 15th Geo. 2nd, we are authorized to assume this, not only because of the change that had taken place in the principle which we have supposed the offence of champerty at common law to have been based, but because Lord Coke has expressly declared, that the statute of Westm. 1st was the foundation of all the acts and book cases that ensued. 2 Institutes, 209.

There we see that these loose notions of the common law was merged in the British statutes, and that at the time we adopted the common law, the party was to be punished according to the pains and penalties affixed by those statutes; and it will be seen that our act introducing the common law, has this provision : "Nor shall any of the British statutes for the punishment of crimes and misdemeanors be in force in this State." This clause shows that it was the

Munford vs. Wilson et al.

intention of our legislature to make its own criminal code. I presume it will not be con, tended, that when we took the common law we took it with all its absurd notions of what is denounced as crimes against society. If we did, I see no reason why a party may not now be indicted for witchcraft or sorcery, and punished as if they were common law offences, But, to come directly to the point in the case at bar, suppose that the defendants were indicted for making this contract with the plaintiff, (for if it was an offence they were all equally guilty) what would be the charge? It would be, that they had employed the plaintiff to prosecute his suit for them, and in consideration of his services had agreed to give him part of the lands, if recovered, they not being in possession of the same. This, if any, is the offence. Under our statute authorizing a party to sell his claim as effectually when out of possession as if in possession, can it be pretended that a conviction could have been had under the ancient common law, in the face of this provision of our statute? Certainly not. Then, if the contract is good by the statute, there is no "higher law," and this court is bound to sustain it. To show the court into what confusion and absurd notions the ancient common law had run on this subject, I will give a few abstracts : Russel on Crimes, vol. 1, side pages, 177, 178, in speaking of champerty and maintenance, says, that by the ancient common law, any one who gave countenance to another in his suit will come under this notion, "as if a person of great power and interest says that he will spend a sum of money on one side, or that he will give money to labor the jury, whether in truth he spend any thing or not; or where such person comes to the bar with one of the parties and stands by him while his cause is tried, whether he say any thing or not." This authority is referred to, to show that such acts as these constitute the offence. Buller in Masters vs. Miller, 4 T. R. page 340 says: "It is curious, and not altogether useless, to see how the doctrine of maintenance has from time to time been received in Westminster Hall. At one time, not only he who laid out money to assist another in his cause, but he who by his friendship saved him an expense that he otherwise would have been put to, was held guilty of maintenance. Nay, if he officiously gave evidence it was maintenance, so that he must have a subpoena or suppress the truth. That such doctrine, so repugnant to every honest feeling of the human breast, should be laid aside, must be expected. How are these undefined notions of what the ancient common law was, which the English judges pronounced to be repugnant to every honest feeling of the human breast, in the face of our statute, at this day and in this country, to be invoked and made the rule by which this court will declare this contract void? This surely cannot be.

This contract cannot be attached on the ground that any undue advantage was taken of the defendants; no, the bad faith and dishonor is with them; they do not make this a defence in their pleadings, and as no issue was raised on this point, and no proof taken by either party on it, it would be travelling out of the record to raise this question. When this question is raised and the proof taken upon it, then, and not till then, can the court consider this as a defence. If the defendants had raised it, the plaintiff was prepared to meet it and refute it by proof. No; the defence made to the contract is, that it is void and champertous by law, and can it be that any court that understands the free and commercial spirit of our laws and the genius of our institutions, will exhume from the tombs of feudal barbarism this defunct doctrine of the ancient common law, and in the face of our statute apply it as a living principle to check the citizen in legitimate commerce. This doctrine was made for feudal slaves and not for freemen. Our supreme court has virtually repudiated it, as will be seen by a careful examination of the case of McGirk vs Chauvan, 3 Mo. Reports, 170; that this court clearly recognizes the principle, that a contract made with an attorney, by which he is to receive a part of the damages recovered, is not void. The court is also referred to a case in Iowa, which will be furnished, in which that court, in an able opinion, repudiates the idea that the undefined notions of the British judges, as to what constituted the offence of champerty, is in force in that country. But the most powerful, learned and practical examination of this subject, as applicable to our laws and institutions, that I have met with, is to be found in 3 Cowen, 643, Tallhem vs. Brinkorhoff, and 3 Harrington, (Del.) Byrd vs. McLain, 139, before cited. To these two cases the court is specially referred. All the authorities agree, that it is not

champerty, if the party has legally acquired an interest in the thing in suit. See case in 3 Cowen, above cited; 1 Greenleaf 's Rep. 292, Given vs. ————. By the English statute on champerty, a party could not legally acquire an interest in a chose in action, or a thing in suit. By our statute, a party can acquire an interest as effectually in a thing in action as in a thing in possession. Then, if the plaintiff had legally acquired an interest in one-third of forty arpens, he is not guilty of champerty or maintenance. The contract to convey one-third when the suit should be determined, in consideration of the plaintiff's professional services, was as valid as if they had covenanted to convey to any one else for the money consideration of fifty thousand dollars; and if the defendants had made a contract to convey for a money consideration, and the land was recovered, they would have been, under our statute, bound for the contract, and the courts would have enforced it.

I come now to the *second* ground of defence, viz: "that the plaintiff's right of action, if any, was on the second contract." This defence is a mere technical one, and does not reach the merits of the controversy. The question is, were the services performed? Did the defendants accept and sanction them? And what was the plaintiff's compensation? By both contracts it was to be the same. The contracts are *executory* and not *executed* contracts, and if the plaintiff had a right of action on either, it was not for a past consideration, but it arose upon services to be rendered after the contract was made. It is *admitted* by the defendants, that Mr. Todd abandoned the contract to which he was a party, and never acted under it, and assigned it to the plaintiff; that after this, the plaintiff brought suit for the forty arpents described in the first contract; that said suit was brought in November, A. D. 1845; that after he had prosecuted the suit for over twelve months, he effected a compromise with O'Fallon for a part of the forty arpents; that the defendants sanctioned and approved of it, and executed a deed to O'Fallon, and settled with the plaintiff according to the term of the contract sued on. In making this compromise, the plaintiff exercised a power under the first contract not given in the second. After this compromise was made, the plaintiff continued to prosecute the suit against Carr and others for the balance of the forty arpents specified in the contract sued on up to 1849, when the defendants, without notice to the plaintiff, compromised the same. Up to the time when the suit was finally disposed of, the evidence shows that the defendants, in the strongest terms, accepted and approved of the services of the plaintiff in prosecuting the suit. In construing executory contracts, where the right of action depends upon services to be rendered after the contract is made, the court will hold the party bound by his acts where he accepts and receives the fruits of the services rendered. Now it is perfectly manifest, from the acts of both the plaintiff and defendants, that the services were rendered under the contract on which the suit is brought, and the defendants, by accepting the fruits of them, are now estopped from setting up the bare and naked contract, which was abandoned by Mr. Todd as a defence to this action. This defence is utterly destitute of every legal and meritorious consideration, because the defendants admit that Mr. Todd abandoned the contract to which he was a party, and never acted under it; and the suit which they compromised was brought by the plaintiff, as their attorney, after Mr. Todd abandoned the matter. And what makes this defence still more objectionable, is that the plaintiff was acting under the second contract, which all the facts contradict. This compensation was the same as it was by the first. If the plaintiff's right of action depends on his having performed the services, and of the defendants having accepted them, and his compensation was to be the same by both contracts, it is immaterial under which contract he acted, as the defence admits that Mr. Todd never acted under the contract to which he was a party, and as the judgment is for the right party, this court will not revive it. But, as before stated, all the facts show conclusively, that the services were rendered under the contract sued on, and that the defendants, by accepting them, are estopped from saying that they were not. Again, under our new code of practice, the defendants cannot avail themselves of this defence; by it all special forms of action, and all distinctions between law and equity are abolished. Our pleadings are by petition and answer. In this case, the plaintiff alleges the making of the contract sued on and his performances under it. The defendants, in their answer, as grounds of defence, set up the

second contract, and it forms a part of the pleadings. On the trial they admit that it was abandoned by Mr. Todd, and that he never acted under it, and that after it was so abandoned, plaintiff brought suit for the forty arpents specified in the contract sued on, and prosecuted the same up to the time the defendants secretly compromised it, and during all this time they accepted his services and ratified his acts, and received the fruits of his labor; but the same contract, which they admit Mr. Todd abandaned and never acted under, they set up as a bar to this action, and it will be seen that after this contract was abandoned, so far as his suit is concerned, in executing the contract sued on, the plaintiff substantially performed the terms of the other contract; for by both his compensation was to be the same, and the defendants, by their acts, are now estopped from repudiating what they had approved up to the time that they received the eight thousand dollars paid upon the compromise. The defendants, by the answer, make the second contract form a part of this case. By our new code, sec. 3, art. 17, is provided, that when an answer is filed and the case tried, the court may grant the "plaintiff" any relief consistent with the case made and embraced within the pleadings. By article 11, sec. 6, it is provided, that no judgment shall be reversed for any error or defect that does not substantially affect the merits of the case. Under these provisions of the code, the court clearly had the power to give the judgment it did, and it is the settled practice of this court, irrespective of the code, that this court will not reverse where all the facts show that the judgment is for the right party. The facts, the law and justice, demand that this judgment shall stand, for it will be seen, that it has been about seven years since the plaintiff commenced his labors for the defendant, and near three years have elapsed since they received eight thousand dollars upon their own copromise, in violation of their contract; and now, after this lapse of time, this court is asked to tell the plaintiff that he must commence a new suit, when it is not denied that his compensation on the second contract, is the same as charged in this suit.

The plea of infancy, also, is of no avail, for the acts of the party after she arrived at the age of majority in law, so fully ratified the contract that it is unnecessary to cite authorities on this point or to notice it further.

The objection taken to the judgment in the assignment of errors, "that it does not state the facts upon which it was founded, and the conclusions of law upon them cannot be sustained: First, because the statement of the case shows that the facts upon which the judgment was rendered were agreed to, signed by the parties and the case was submitted to the court below upon them. If the defendants felt themselves agrieved by this judgment and wished a review of it by the court below, all the facts on which they could ask the court to review it were contained in the agreed case, and it was not necessary to state them in the judgment: it is only necessary to state the facts in the judgment where they are contested. The law is satisfied when the record shows that all the facts necessary to a review are agreed to, signed by the parties and filed with the papers. Secondly, This objection comes too late. The act provides, that where a case is tried by the court, if the defendant wishes a review of the judgment he must make his application within four days, stating such facts "as may be material to the question to be raised." This the defendants wholy omitted to do, but he filed his motion for a new trial, as if the case had been tried by a jury, and in it does not even assign this as ground of error. If the defendants had, in the manner provided for in the act, specially brought this matter before the court below; if there had been any defect in it the court could have corrected it, but I have shown that the facts were not contested, but agreed to and filed, and so it was not necessary to place them in the judgment. The judgment cannot be reversed on this ground, because the reason of the rule was satisfied when the facts were argeed to, signed and filed.

Again, it would encourage an unfair practice and this court has again and again held that it will not notice an objection not distinctly and clearly made in the court below: See 8 Mo. Rep. 59; 9 Mo. Rep. 48.

---

---

## L. M. GRAY, for the same.

The agreed case, on which the cause was submitted to the court below, clearly entitles the plaintiff to the judgment rendered, unless some one of the defences set up by the defendants in their answer, are available to defeat it. These are,

1st. That the contract was maintainous, champertous, against public policy and void by law.

2nd. That the second contract of the 8th of June, 1845, superceded and annulled by its terms and of itself the contract of 6th of June, 1845, sued on by the plaintiff.

3rd. That the plaintiff had not properly performed the contract sued on.

4th. That the defendant, Cornelia V. Hempstead, (now Wilson) was a minor when she made the contract sued on.

The above grounds of defence embrace all the grounds and points raised in the instructions asked by the defendants and refused by the court below. If, on investigation, the grounds are not available to the defendants, as a defence, the judgment must stand; unless,

5th. The court below erred in giving the instructions of the plaintiff, and unless,

6th. The judgment is informal in not showing the facts on which it is founded, and the conclusion of law upon them.

I shall consider these points in their order.

I. As to the question of Champerty, &c.

The contract is legal and valid. There is no champerty nor maintenance in the State, or, at any rate, the contract sued on is in no way affected or vitiated by reason of the provision in it, that the plaintiff was to receive in case of success, one-third of what might be obtained by suit or compromise. Our legislature in introducing the common law and English statutes of a general nature, did not make a part of the law of this State, the prohibitions of the English law against champerty and maintenance, for the plain reason that the enforcement of champerty and maintenance laws, in the words of our statute introducing the common law "are repugnant to and inconsistent with the constitution of the United States, the constitution of this State and the statute laws in force:" See Rev. Statutes 1845, page 693, sec. 1, art. 1, chapter 100. The English statutes creating the offence of champerty and maintenance were local, passed to remedy local evils which, from the peculiar state of society there at the time, were oppressing a portion of the population: Russel on Crimes, vol. 1, page 179 and following. The object was to prevent the King's officers, judges, counselors, &c., from interfering with the due administration of justice. Those laws were enacted by a monarchy to restrain its own ministers and officers from oppressing the people, or by royal houses to protect their favorites and partisans from annoyance on the part of those whose estates had been confiscated. It is apparent from the history of the laws of champerty, that they were local and temporary expedients by parties in power after revolutions, to protect themselves against those that they had ousted of their property.

The English statutes against champerty were penal. Those violating them were liable to indictment and punishment, at the pleasure of the king and with forfeiture of estate. Will any one pretend that the penalties, punishment and forfeitures of the English law are operative here? What reason is there to contend, that such part of the common law or of English statutes as will avoid the contract, are in force? The penalties and forfeitures of the English law are not in force here; for all forfeitures are expressly abolished: See Revised Code, 1845, chapter 9, "Crimes and Punishments," page 412, sec. 22.

Again, prohibitions against champerty and maintenance, whether in the common law or English statutes, are in every sense repugnant to and inconsistent with our State constitution and the whole theory and character of our government and institutions. With us, all are equal and all power is in the people themselves, and not in a power over and above them: See Declaration of Rights, sec. 1. There is nothing in our State of society or social or political organization that requires the enforcement or enactment of any law against the validity of such a contract as the one sued on in this case. Here are no superior classes to overawe, oppress or take advantage of others. The largest liberty belongs to the individual and the right to do with one's own as he pleases, to manage his own property and business, to make any contract in relation to the same

Munford vs. Wilson et al.

that pleases him, is guarantied and belongs to each individual; and all contracts which are not founded in fraud and which are not in violation of an express law, in which no undue or unfair advantage is taken, and which do not contravene the great principles of right, when entered into, will be enforced by our courts.

The contract before the court does none of these things. On the contrary, such contracts are made daily and carried out and honorably fulfilled by the parties thereto. I doubt whether there is a lawyer at the bar in this State, and perhaps none on the bench, who has not, if he be old in practice, at times and repeatedly made similar contracts, and in doing so no one for a moment dreamed that he was violating any principle of law, justice or sound policy. I venture to affirm, that the universal sentiment of the legal profession in Missouri is in favor of the lawfulness and justice of such contracts as the one sued on. The position of the profession here is not one of such superiority as gives them any advantage in making a contract. If, however, in such a contract, any unfair means are used by the attorney or any unconscientious advantage is obtained, the court might declare such a contract void for that reason. This, in our State of society, will be restraint enough. The whole tendency of the courts and of the age, and I may say of truth and philosophy, is, to judge of transactions by their own circumstances and merits, and to do away with all conventional, arbitrary rules. Formerly, many things by arbitrary principles of decision were held fraudulent "per se," but in progress of society and the advance of intelligence, courts and legislatures too, break down all false and conventional rules, look into the special facts of each case, and enquire if fraud, in fact, exists. This is the only truthful and philosophical mode of judgment.

Formerly, "choses in action" were by arbitrary rules forbidden to be assigned; gradually the courts removed these unwise restraints and protected the rights of the assignees, till at last our legislature has placed them on the true ground, and permits the free transfer of this species of property.

But our statute by authorising the sale of lands held in adverse possession, has, in my opinion, not only abolished all champerty and maintenance, if any could have existed here, but has also clearly sanctioned just such contracts as the one now before the court: R. S. 1845, page 219, section 4.

The essence of champerty was the transfer of title to lands in adverse possession. Against this the English law was particularly directed, and this was the evil they were intended to remedy. By authorising the sale of lands in adverse possession, the legislature has virtually removed all restraints on the liberty of contracting about real estate that were imposed by the laws of champerty and maintenance. If a sale of the forty arpens is valid by operation of the statute, is not a contract to convey, in case of recovery, equally so?

Again, even the English law allowed a person having an interest in the subject matter of the suit, to aid in the prosecution: See Russell on Crimes, vol. 1, pages 177-8. Now, as our statute allows of a sale in adverse possession of necessity, a contract to sell or convey lands in adverse possession is legal and valid. For, if to do the thing is legal, an agreement to do it must be equally so. Plaintiff then under the contract sued on, acquired a legal interest in the forty arpens which even under the English laws would enable him to prosecute a suit for the land.

But I consider that our supreme court have already by a decision established the legality of a contract like the one before this court: See 3 Mo. Rep. side page 236, McGirk vs. Chauvan's adm'r. In this case, though it does not appear that the question was raised, yet it does appear that it was a contract like the one now before the court. McGirk (the same, I suppose, who was afterwards a judge of the supreme court) was to have three-fourths of all damages and wages that should be recovered in four actions of replevin and a fixed fee besides. He recovered three-fourths of the one cent damages recovered in one of the suits, and the supreme court affirmed the judgment. Is it to be presumed that they would affirm the judgment, if they had supposed that under the laws of Missouri the contract was null and void against law and public policy? Clearly not, and I quote the case with confidence as showing that in the opinion of the supreme court, that contract, like the present one, was legal and valid.

And I would ask, if to aid one in recovering his rights is champertous and maintenance under

Munford vs. Wilson et al.

our laws, why is it that the legislature and the courts require persons supposed to be insolvent or non-resident to give security for costs on penalty of dismissing their suits? Will the law compel the suitor to bring in his friend or neighbor to aid him, by being bound for costs, and when the security has paid costs and sues the suitor to recover it, will the law interfere and prevent the security's recovering the costs, on the ground that the contract between him and the suitor was illegal, champertous, maintenance, and against public policy and void? Is it not as illegal, void against public policy, champertous and maintenous to furnish a party money to pay costs or to go security for him, as it is to bring a suit for him and do the laborious professional work? Is it not as legal and just that the attorney should recover his fee when he has done the work, as it is that the security should recover the costs when he has paid them?

If the defendants had agreed to pay plaintiff a certain and fixed fee, there would have been no doubt about plaintiff's recovery of it. Does the mere fact of its being contingent in amount, defendant on the event of recovery, make the contract illegal and void? Certainly not. Does the mere fact of the fee's coming out of the property recovered make it illegal, void and against public policy? I cannot see it in that light. But I will close, on this point, by saying, that even in England, where champerty and maintenance originated in feudal times, and where it exists now, if at all, the courts in modern times, acknowledge the uselessness and absurdity, and in many cases the injustice of champerty laws: See Mason & Welby's Reports, Vol. 11 pages 675, 682.

In most of the States of this Union, if not all, where contracts have been declared void for champerty, they have been declared so under statutes servilely copied or re-enacted on the English statutes.

As to the tendency of the courts on other States where they have champerty laws, to get round and overcome them: see 3 Cowen R. 647; 3 Summer R. 476; 1 Greenleaf R. 292.

Wherever the question has come up in any of the States, where they are not trammelled by these statutes of the dark ages, they have decided the matter according to the plain rules of common sense and common justice: see 3 Harrington's Rep. (Del.) 139, Bayard vs. McLain. In this case the question is discussed fully and ably: See, also, the case of Wright vs. Meek and others, decided in Iowa. This case is reported in the Sept. No. of the Western law Journal 1851, page 545.

II. Does the contract of the 8th of June, 1845, made with plaintiff and Albert Todd, rescind or supercede the contract sued on?

The court will observe, in the first place, that there is no proof of any kind on this subject, except the fact, that the second contract was made with the plaintiff and Todd, after the making of the first. There is no evidence to show, not the slightest, that it was the intention of the parties to rescind and cancel the contract of 6th of June, 1845. The defendants merely show and set up the second contract as being in force and as superceding the first, and without the slightest proof of what was the intention of the parties, asked the court below and ask the court here, as a question of law, unaided by any evidence, to declare the first contract superceded and annulled by the simple fact of making the second. With this in view, I will examine the point in connexion with the circumstances surrounding the parties, at the time, and in connection with their subsequent acts.

1st. I remark, that there is no express rescinding of the first contract by the second, because the first is in no way alluded to or mentioned in the second.

2dly. I remark, that the first contract, notwithstanding the making of the second, was left out, standing in the hands of the plaintiff.

Now, is it not reasonable to suppose, that if it was the intention of the parties, that the second contract should rescind the first, that the defendants would have either so stated in the second or would have taken up the first?

There being no express cancelment, and the first contract being left in the hands of the plaintiff, the question arises, whether terms of the second contract are such, that by necessary implication, it rescinded the first. If they cannot both stand together, then a rescinding of the first may be inferred, but if both can stand together, that fact, I suppose, is conclusive

against an implied rescision. Both contracts can stand together; that is, leaving the first contract in full force, there remains a subject matter for the second contract to take effect upon, as the reason for which it was made. The subject matter of the first contract is the recovery of a forty arpent tract, bought by Thomas and Charles Hempstead on the 8th day of January, 1818, and no other property. The subject of the second contract is to ascertain and establish the rights of defendants in and to the estates of Thomas and Edward Hempstead. The estate of Edward Hempstead is a part of the subject matter of the second contract, and is a new subject matter, which the first contract did not touch. If, therefore, the 40 arpent tract, which alone forms the subject matter of the first contract, was the whole of the estate of Thomas Hempstead, which it was not, there still remained the estate of Edward Hempstead, which is not mentioned in the first for the second contract to operate upon. It being clear, I think, from the considerations stated above, that there was no cancelment of the first contract by the second, by implication, inasmuch as both have a subject matter on which to operate, independent to each other, let us next look at the conduct of the parties, to see how they understood them, as shown by their acts. On the 16th of October, 1845, before any steps are taken to bring the suit, Todd assigns all his interest in the second contract to plaintiff, and it was admitted, that Todd had never acted under the second contract. He abandons it and refuses to act. By this abandonment, the second contract became a nullity, unless the defendants chose to let plaintiff perform it alone. On the 5th of November, 1845, plaintiff commences alone, a suit for the 40 arpents of land named in the first contract. In doing this he appears to be acting under the first contract, for he is suing for the identical land described in the first contract and for no other. He is also acting alone, as he was authorized to do, by the first contract, and not by the second. Todd, at this time, had already withdrawn and refused to perform. The defendants have notice of plaintiff's action in the premises, and recognize and adopt his proceedings. Was not the fact that defendants permitted plaintiff to go on and sue alone for the 40 arpents, without objection, an assent to his performance of the first contract? It was either this or it was an assent to his performance of the second contract alone. But if the defendants, after the abandonment of the second contract by Todd, accepted a performance of it by the plaintiff, individually, then clearly they made it, by their own acts, a contract with him individually, and having set it up in their answer, as a valid and operative contract, they cannot object to a recovery upon it.

But to trace the conduct of the parties still further, in order to see which contracts their acts show plaintiff was performing, we find, that in 1847 plaintiff made a compromise with O'Fallon, one of the defendants in this suit, in the circuit court, for such interest in the 40 arpents as he claimed, for the sum of $2100. If, up to this time, there could be any doubt, which contract the plaintiff was performing, this act of compromise must entirely remove the doubt. For, by the first contract, the power is expressly given to the plaintiff to compromise the claim to the 40 arpent tract, at his discretion, while no such power at all is given in the second contract with plaintiff and Todd in regard to the two estates therein mentioned. This is conclusive, that the plaintiff was performing the first contract and exercising the powers contained in it and withheld in the second contract. The defendants, by receiving $1400 from the plaintiff, two thirds of the sum obtained by him on this compromise, and by making a deed to O'Fallon in conformity to it, expressly and unequivocally adopted, ratified and sanctioned plaintiff's performance of the first contract, beyond all ground of cavil or controversy. But, if further confirmation is needed, the case fortunately furnishes it. In the conversation between McCamant and Mrs. Hempstead and Cornelia V. Hempstead (now Mrs. Wilson in relation to the compromise with O'Fallon, they speak of plaintiff as their attorney, not one of their attorneys; and, as having made said compromise, and that he had done more for them than any other attorney they had ever employed. Here, then, is a clear recognition by defendants of performance of the first contract.

In regard to the appearance of Field and Haight in the case, with Munford, I remark, that they came in at the request of Munford, to give him such assistance as he might need in the difficulties of the case. They were not employed by the defendants nor paid by them, but

**were assisting** Munford, at his own request. Defendants always regarded Munford as their only attorney in the case, and always addressed him and treated him as such. Wilson's letters to the plaintiff, dated 9th May 1849, speak to and of him as the sole attorney of the defendant in this case. It is to be observed, that the consideration of both contracts is executory, services to be performed after the making of the contracts. Suppose that the making of the second contract gave defendants a right to declare the first rescinded, which we deny, and that the plaintiff, after the withdrawal of Todd, undertook to perform and did perform the first contract, with the approbation and sanction of the defendants up to the 28th of November, 1849, (at which time the defendants by the compromise made by them, prevented further performance,) has he not a right to recover on the first contract? If the acts of the parties are good to waive the first contract, are they not equally good to waive it again.

III. The third ground of defence is, that plaintiff did not faithfully do his duty and perform the contract sued on. By setting up this defence, defendants, in effect say, "true you undertook to perform the contract, but you did not do it as you ought to have done it. You did not show proper skill in managing that suit and therefore you are not entitled to recover."

I shall speak on this point briefly. After all the lavish and emphatic charges in the answer, of unskillfulness in the management of the suit, there was not a scintilla of proof establishing or tending to establish a single charge made, unless the admission by plaintiff, that the demurrer to his original bill was confessed by him, may be considered such. I will only say, that the oldest and ablest lawyers could, more or less, be accused and convicted of the grave charges made against them, or confessing a demurrer to a bill in chancery were evidence enough to sustain the charge. It appears too, from the evidence in this case, that a plea, filed for Carr in the chancery suit in the circuit court by his counsel, Messrs. Gamble & Bates, and Spalding was withdrawn and an amended plea filed, and then that withdrawn and Carr's answer finally filed. Would that fact be any ground for charging either of those able, skillfull and experienced gentlemen with a want of ordinary professional ability? The defendants introduced two motions filed by Munford in the case of Carr vs. Biddle and others. These were proper motions, in accordance with chancery practice and unobjectionable, unless it is intended to charge plaintiff with abreviating his words or perhaps misspelling. If this last is the object, I reply to it by referring the court to the bill of exceptions in this case, and to the statement also, both prepared by the attorney on the other side, in which he has spelled lose, *loose*, and handsome, *hansome*.

But to rebut all insinuations that plaintiff did not properly perform the contract, I refer to the statements of Mrs. and Miss Hempstead to McCamant in 1847, and to the letters of Wilson to the plaintiff within only a few months before the defendants prevented plaintiff's further performance of the contract by the compromise and dismissal of the suit, by which it will be seen, that defendants not only highly approve plaintiffs management of the case, but give him the enviable credit of having done more for them than any lawyer they ever had. Observe, there was never a word of complaint until defendants were sued.

IV. Defendants also urge, that Miss Hempstead was a minor when the contract was made with the plaintiff. This, I presume, is not seriously urged. If it is, I have only to say, that after she became of age, in 1847, she knew of the plaintiff's conducting the suit, was advised of the steps he was taking in the matter, and by retaining him, consulting with him and recognizing him as her attorney, as she did do till her marriage, she ratified and confirmed the contract, and after her marriage both she and her husband did the same.

Miss Hempstead, by accepting and adopting the plaintiff's compromise with O'Fallon, by receiving from the plaintiff two thirds of this $2100 and allowing him to retain one third of it, which was a settlement with the plaintiff, on the exact terms of the contract sued on, by making the deed to O'Fallon, and above all by the express adoption and approval of the plaintiff's management of the suit and making the compromise, shown by the statements to McCamant, clearly and unequivocally ratified the contract sued on. Wilson, also, after his marriage with Miss Hempstead, by his letters to the plaintiff, before referred to, ratified the contract. I would also remark here, that these acts of ratification, both by Miss Hempstead be-

fore her marriage and by Wilson after the marriage, are bound to apply to the contract of 6th of June, of 1845, made with Munford alone and sued on.

Because these acts of ratification were in reference to the identical property and none other described in the first contract.

Because one of the acts of plaintiff, expressly ratified, was the exercise of the power to compromise, which is expressly given in the first contract and not in the second.

Because when Miss Hempstead became of age she found the plaintiff carrying on the suit alone, for the 40 arpent tract, and this together with the knowledge of plaintiff's exercising the power to compromise, granted him by the first contract, was notice to her that he was seeking to perform the first contract. Besides, the second contract had become inoperative and null, by reason of Todd's abandonment of it, and her ratification could not be held or construed as applying to that; or, if it did apply, its effect was to ratify it as a contract with Munford individually and alone. Believing that from the considerations above alluded to, and from others that will be obvious to the court, that no one of the four grounds of defence set up in the answer of the defendants, is in any way available to affect the plaintiff's judgment, and as those four defences, already considered, are the only questions raised in the defendant's instructions, which were refused, I shall not particularly review the defendants' instructions, deeming it, after what has been said, unnessary to do so.

V. Did the court below err, in giving the plaintiff's instructions?

The first instruction given declared that the second contract did not, of itself, supercede, annul, or in any manner, satisfy the first contract, which was sued on. This I believe to be true, and have endeavored to show it to be so by what has been said under point II above, to which I now refer. It seems to me too plain for argument, when we look into the two contracts and see that both can stand together. The second contract includes the estate of Edward Hempstead, which is, in no way, embraced in the first contract.

The second instruction given declares, that if after the making of the second contract, Todd refused to perform it, and plaintiff, thereupon, with the consent of the defendants, proceeded to execute and did execute faithfully the first contract, he is entitled to recover, if defendants violated the same.

The correctness of this instruction is obvious, on reading it. It verifies itself and cannot be made plainer by comment. The only questions that can arise under this instruction are, whether the facts before the court below would authorize a finding for the plaintiff? The agreed case shows that Todd abandoned, on the 16th of October, 1845, the second contract and never acted under it, and that the plaintiff on the 5th of November, 1845, proceeded to execute the first contract by suing for the 40 arpents, the specific subject matter of that contract; that defendants knew of, approved of and accepted his services under the first contract; expressly ratified the exercise by him of the power to compromise, given in the first, and withheld in the second contract, by accepting the plaintiff's compromise in 1847 with O'Fallon, and the agreed case also shows, that the plaintiffs performance was highly successful and satisfactory to the defendants, as their own statements prove, up to the very time of prevention by defendants, in making the compromise with Carr and Biddle for $8000. The facts in the case most clearly and fully meet the instruction, and there is no error, either in the instruction or in the finding under it for the plaintiff.

The last instruction given for the plaintiff is equally correct as a proposition of law, and has fully the facts to sustain a finding under it for the plaintiff. It differs from the preceding instruction only in this, that it asserts that if after the abandonment of the second contract by Todd, the plaintiff, with the consent of the defendants, undertook to perform and did perform the first contract, and in doing so also performed the second contract, there being no substantial difference between them, and the defendants have refused to comply, on their part, nothing in the second contract can prevent plaintiff's recovery. This proposition is unquestionably correct. If it were necessary, I would be willing to go farther than the instruction does, and say that if this court should be fully satisfied that the second contract superceded the first, still plaintiff is entitled to the judgment. For if the plaintiff was not acting under

the first contract, he was under the second. . The defendants have set up the second, and assert that that is in force. If it is in force, then the defendants, by accepting a performance of it by Munford alone, after Todd's abandonment, have ratified it as a contract with Munford alone, and of course, with both the contracts before the Court, and proof of the acceptance by defendants of a performance of the second contract by Munford individually, they have made it their contract with the plaintiff alone, and under our code, the plaintiff would be entitled to his judgment on the second contract; the compensation in both contracts being precisely the same, however much they may differ in other respects. The defendants cannot complain of this, for they admit that the second contract is in force, and being in force and before the Court, plaintiff is entitled to his judgment on the second contract, if the Court should be of opinion, that the second contract was substituted by the parties for the first and performed by the plaintiff alone. This, manifestly, was the case, unless the plaintiff was, as we assert, performing the first contract. In this view of the case, it is immaterial which contract the plaintiff was acting under, or on which he holds his judgment, for on one or the other of them, he is bound to stand. If on the case made by himself, he cannot recover, he clearly can on the case made by the defendant.

VI. Is the judgment informal in not showing the facts on which it was founded and the conclusion of law upon them?

Certainly not, for the matter was submitted to the court below on an agreed case in writing. It was made an agreed case, with all the facts written down and signed by the attorneys of the parties, with the single exception of McCamant's testimony, which was taken before the court by agreement in the agreed case that was filed. It was transferred from the trial docket to the law docket as an agreed case; so submitted to the court, as the record shows; so treated by the court and the parties and the judgment entered upon it as such. But if it was a case, requiring such a statement, the error, if any, has not been so saved by the defendants as to enable them to raise the question here: Art. 15, sec. 3 of the Code.

No application for a review was made by the defendants below, as required by the section referred to. The motion filed by defendants for a new trial, did not make the want of such a statement a ground for a new trial; consequently the point was never made or passed upon by the court below, and the defendants have waived the omission, if it be one. To ask this court to reverse for this reason, would be to ask it for a matter outside of the record and on a point never passed upon by the court below, and on a point to which no exception was ever taken by the defendants.

But the settled practice of this court disposes of this point completely in favor of the plaintiff, as does also the statute regulating practice in the supreme court, section 32: See 8 Missouri Reports 59.

The supreme court will not decide a point which has not been saved and passed upon below and excepted to: 8 Mo. Rep. 128; 8 Mo. Rep. 136; 10 Mo. Rep. 515; 13 Mo. 455.

These decisions settle that question.

GAMBLE, J., delivered the opinion of the court.

The judgment in this case professes to be upon a case agreed, and the record contains an agreement signed by counsel, as well as letters and a deposition, which all appear to have been considered by the court.

Although the judgment has the agreed case for its foundation, the parties asked the court for a great number of instructions, of which some were given and some refused.

It is our understanding, that a judgment upon an agreed case is a judgment upon the facts which the parties have assented to and signed, and

which agreement stands in lieu of a special verdict.   The agreement is not, in such case, used as evidence before the triers of fact, but is designed to form a part of the record, and upon it the court pronounces the conclusion of law, as would be done if the same facts were found by a jury, in the form of a special verdict.   The parties may agree to certain facts involved in the case, which they do not wish to controvert, while they still dispute other matters of fact on either side.   In such case the agreement when signed, is used before the tribunal which tries the question of fact, as evidence, concluding the parties so far as they have agreed, but in that case, the judgment will be upon the finding of the facts and not upon an agreed case.   This is mentioned at present for the reason that while counsel, with a proper and laudable desire to avoid useless and expensive controversy about facts which they do not consider material to the interests of their respective clients, make agreements in relation to such facts, they may be apprised of the damages to their clients if they neglect to have the record exhibit the case in its proper legal aspect, so as to present the questions for review before this court.

In the present case, as the judgment by its own terms rests upon an agreed case, we look through the transcript to find it, and when found, we take the judgment to be the conclusion of law pronounced by the court upon the facts agreed by the parties.   The instructions which were passed upon by the court below, are only useful here as a kind of index to the questions of law which the parties understood, properly arose upon the facts agreed.   We deal with the conclusion contained in the judgment.

The following is a sufficient synopsis of the facts in the case, to show the questions of law involved:

Cornelia Hempstead, the widow, and Cornelia V. Hempstead, the minor daughter and heir of Thomas Hempstead, deceased, claimed to own or to have an interest in various portions of real estate of the deceased, which were held by other persons adversely.   On the 6th of June, 1845, a contract was made between them and Mr. Munford, the plaintiff, who was an attorney and counselor at law and solicitor in chancery, which was signed and sealed by them, but not by him, by which they engaged his services as their sole counsel, to establish their right to an interest in a certain forty arpent lot, partly within the city of St. Louis, which had been purchased by Thomas and Charles S. Hempstead from Margaret Hebert dit Lecompte, on the 8th of January, 1818. They authorized him to institute such proceedings in law or equity as he might judge proper to assert their rights, and to compromise their

claims as he might judge advantageous for them, covenanting to give to Mr. Munford one-third part of whatever might be realized to either of them by compromise, or if property was recovered, to convey to him one-third part of what might be recovered.

On the 8th of June, 1845, there was another contract made by which it is recited that the estates of Thomas Hempstead and Edward Hempstead were in great confusion, and that Cornelia, the widow, and Cornelia V., the daughter of Thomas Hempstead, have rights and interests in said estates, the enjoyment of which they were deprived of by the pretended claims of others, and therefore they engaged the professional services of Mr. Munford and Mr. Albert Todd, and agreed that they should be the sole and only counsel for the purpose of establishing the rights of the ladies in both of said estates.   The attorneys were authorized to institute such suits as might be necessary to establish the rights of their clients, and the clients engaged that the attorneys should receive one-third of all property, money and effects to which the rights of the client should be established, as a compensation for their services.

Mr. Todd never performed any services under this contract, but in October succeeding its date, assigned all his interest under it to Mr. Munford.   This latter gentleman, in November following, commenced a suit in chancery to recover a part of the property which is described in the agreement of the 6th of June.   While this suit was pending one of the parties, defendant, compromised with the complainants through Munford the solicitor, and paid him $2,100 for the relinquishment by the complainants of all their claim to the property which he held.   The complainants executed the deed conveying their right; Munford received the money, and retaining one-third for himself, paid the two-thirds to the complainant, Mrs. Cornelia Hempstead.   Afterwards, the complainants, without the knowledge of the counsel, Munford, compromised with the other defendants, receiving $8,000 as the consideration for their relinquishment.   The object of the present suit by Munford is, to recover the one-third of the money so received by his clients upon this compromise.   The petition is entirely upon the first contract, dated on the 6th of June.   It appears that while the suit brought by Munford for his clients was pending, they recognized him as their attorney, acting for them in the suit and expressed satisfaction with his attention to their interests.   The agreement of the parties states no other facts in relation to the second contract, than that Todd did nothing under it and assigned his interest to Munford.   It was after this assignment was made that the suit was brought in which the compromise was made, and it is apparent that the clients recognized Mr. Munford as their coun cl in that suit

Still, it is not agreed that the clients had any knowledge of the abandonment of the case by Mr. Todd, or of his assignment to Mr. Munford. That Munford should be spoken of by his clients, as their counsel, and his fidelity and diligence be praised, does not involve the knowledge on their part, that he was acting alone in their case, although it establishes the fact, that his professional services were highly satisfactory to his clients. The fact is agreed, that Cornelia V. Hempstead, the daughter, who was a minor when the different contracts were made and who subsequently inter-married with the defendant, Wilson, claimed no interest in the property for which the suit was brought and which was included in the compromise, except as daughter and heir of Thos. Hempstead.

The court below gave judgment in favor of Munford for one-third of the money recovered on the compromise, with interest.

Two questions are now presented for consideration. 1st.—Whether the contract of the 6th of June remained in force and binding upon the parties, after that of the 8th was made between the same clients and Messrs. Munford and Todd. 2nd.—Whether the contract is illegal, because it provides a compensation to the lawyer by giving him one-third of the property in dispute for which suit was to be brought. If the decision is to be adverse to the plaintiff on the first question, it will not be necessary to consider the second, as the parties have agreed upon the record, that if the plaintiff is not entitled to recover upon the contract sued upon, he shall have leave to amend and proceed upon a *quantum meruit* for the services rendered.

In order to determine the first question, whether the contract of the 8th of June is a contract substituted for that of the 6th, it is necessary to ascertain whether the "rights to be ascertained and established" by Munford and Todd, under the second contract, comprehend "the rights and interests to be established" by Mr. Munford under the first contract; for if they do, then it must either be held that the second is a substituted contract or that Munford is entitled to hold under both. That the second is more comprehensive than the first contract, or that in some of its stipulations it varies from the first, affords no presumption against its being designed as a substitute for the first; for if it were identical with the first, in all its provisions and in its scope, there would appear to be no meaning in its execution.

The first contract commences with the recital, "that Cornelia, widow, and Cornelia V., daughter of Thomas Hempstead, claim an interest in a certain tract of land" and "that certain persons are depriving them of the possession and enjoyment of the property, by pretended claims;"

therefore, they engage the professional services of Munford, to establish their rights and interests in the property. In this property it is agreed that the interest of the present Mrs. Wilson, was only as heir of her father Thomas Hempstead.

The second contract begins with the recital, "that the estates of Thomas Hempstead and Edward Hempstead are in great confusion and difficulty, and that Cornelia, the widow, and Cornelia V., the daughter of Thomas Hempstead, have rights and interests in said estates, of the enjoyment of which they are deprived by the pretended claims of others; therefore, for the purpose of ascertaining and establishing their rights and interests in both of said estates they thereby engage the professional services of Messrs. Munford and Todd."

The compensation to be received under each contract, in the event of a recovery of property, is one-third of all that may be recovered. In the first contract with Mr. Munford, there is the additional stipulation, that he shall have one-third of what may be realized by compromise.

The question to be determined is, whether, immediately after the execution of these two contracts, they were both subsisting agreements. If they were, then, undoubtedly, Mr. Todd had a right to take part in the litigation for the specific property mentioned in the first contract, for that was claimed to be a part of the estate of Thomas Hempstead, and he and Mr. Munford would, in the event of success, have taken under the two contracts, the lion's share of two-thirds of the spoils, while the widow and heir would have received the other third. The subsequent abandonment by Mr. Todd of the contract of the 8th of June and his assignment of his interest to Munford, has no influence in determining the present question; nor is the recognition of Mr. Munford by the defendants, as their attorney, entitled to any weight in its determination. If the last contract superceded the first, the first was not revived, because of Mr. Todd's abandonment of the second, or because, when Mr. Munford proceeded to institute suits, he was recognized as the attorney of the clients.

It is apparent that the specific property described in the first contract came within the scope of the second. It was claimed as property in which the mother and daughter were interested, as the widow and heir of Thomas Hempstead. It was property withheld from their possession and enjoyment by others claiming adversely. The object in employing an attorney was, to establish their rights and interests in the property. The second states the same condition, of the property belonging to the estates of Thomas and Edward Hempstead—the same obstruction to the enjoyment by the widow and daughter of their rights, and the same

object in employing attorneys.   If the first had never been made, there could be no question that the second would include the property mentioned in the first.   There is nothing in the second that excepts that property from its operation.   It seems impossible, when we examine the recitals of both and fix the measure of compensation to the same for the same services to be rendered, to imagine that the parties understood the first to be in force when the second was executed.

As both these contracts are under seal, and of the same dignity, the question does not arise, which has embarassed courts, whether a contract under seal can be varied, waived or discharged by parol.   We look at the two instruments and find that all the parties to the first are parties to the second—that the second comprehends the first in the duties to be performed, and is like it in the compensation to be given. That the chief difference is, in the scope of the second being much greater than that of the first, embracing all the litigation that might arise in relation to two estates, while the first was confined to litigation about the title of one piece of property of one of the estates.   The second engages the services of the same attorney that was employed in the first contract and also of another attorney.

These two instruments form a part of the case agreed, and upon them it is evident that the first was absorbed in the second and was not a subsisting agreement after the second was executed.   The plaintiff claims only under the first and is not entitled to recover under it because of the subsequent agreement.

As the second contract is not before the court for adjudication, it is not necessary to pass upon its merits, but it may be questionable, whether, according to its terms, any specific portion of the money obtained by compromise, can be recovered: Evans vs. Bell, 6 Dana 479.

The question which is presented and discussed in the written agreements filed by the counsel, whether the contracts are void because of champerty, has occupied our attention and the authorities have been examined, but to trace the law on that subject, from its very early history in England, would occupy more time and space than can be properly used in a case in which its decision is not necessary.

As the parties have agreed, that if the plaintiff is not entitled to recover upon the contract, he shall have leave to amend and recover upon a *quantum meruit*, the judgment will be reversed and the cause remanded for further proceedings.